# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

WOODROW FLEMMING,

                            Plaintiff,

      vs.

MATTHEW J. KELSH; TODD LaROSE;.                 9:13-CV-758
JOHN A. McBATH; TIMOTHY J. KELEHER;        (LEK/ATB)
JEFFREY CLEMO; RICHARD W. WINSTON;
BRENT MOULTON,

                          Defendants.

---

WOODROW FLEMMING, Plaintiff pro se
MELISSA A. LATINO, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff claims that, while he was incarcerated at Upstate Correctional Facility ("Upstate"), the remaining[1] defendants used excessive force against him during a "cell extraction," and that his subsequent conditions of confinement were unconstitutional. (Complaint ("Compl.") (Dkt. No. 1). Plaintiff seeks substantial monetary damages.

Presently before the court is a motion for summary judgment pursuant to Fed. R.

---

[1] Plaintiff originally named twenty (20) defendants. On January 15, 2015, the Honorable Lawrence E. Kahn issued an initial screening order in which he dismissed several of the defendants and several of plaintiff's claims. The remaining defendants are: Lieutenant Matthew J. Kelsh; Sergeant Todd LaRose; Corrections Officer ("CO") John A. McBath; CO Timothy J. Keleher; CO Jeffrey Clemo; CO Richard W. Winton (properly spelled Winston); and CO Brent Moulton.

Civ. P. 56, filed by the remaining defendants. (Dkt. No. 36). Plaintiff has responded in opposition to the motion, and the defendants have filed a reply. (Dkt. Nos. 41, 43). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint.

## DISCUSSION

I. <u>Facts</u>

The facts in this case were detailed extensively in Judge Kahn's January 16, 2015 initial screening order. (Dkt. No. 18 at 3-20). In this report, I will summarize only the facts that are relevant to plaintiff's remaining two claims as to the remaining defendants. On July 16, 2010, plaintiff was sleeping in his cell at Upstate. (Complaint ("Compl.") at 8, 15).[2] Defendant LaRose walked by plaintiff's cell and "accused" plaintiff of having his light covered. (*Id.*) Defendant LaRose gave plaintiff a direct order to uncover his light, but then left the area. (Compl. at 15). Plaintiff states that he did nothing because he maintains that his light was not covered. (*Id.*) Defendant Kelsh then came to plaintiff's cell and gave plaintiff a direct order to exit his cell, but plaintiff refused.[3] Former defendant Quinn then authorized calling for an extraction team to remove plaintiff from his cell. (Compl. at 16). The extraction team was called by defendants LaRose and Kelsh and consisted of defendants McBath, Keleher, Winston, and Clemo. (*Id.*)

---

[2] Plaintiff has numbered the pages of the complaint at the bottom of the page. The court will cite to the pages of the complaint as numbered by plaintiff.

[3] Plaintiff alleges that defendant Kelsh "claims" that he gave plaintiff a direct order to come out of his cell and that plaintiff refused. (Compl. at 15).

The extraction team entered plaintiff's cell with a glass shield, held by defendant Clemo, and knocked plaintiff to the floor with the shield, striking him in the head and face, causing plaintiff injury. (Compl. at 17, 19). Plaintiff claims that defendants Winston and McBath, held plaintiff down, injuring plaintiff's shoulder, side, hip, back, legs, and neck. (Compl. at 19). While plaintiff was restrained, defendant Keleher handcuffed him too tightly, causing pain in plaintiff's arms and wrists. (*Id.*) Plaintiff claims that the members of the extraction team "assaulted" him. (*Id.*)

After plaintiff was taken out of his cell by the defendants, they brought him to 11 Block, where he was examined by medical staff. (Compl. at 18). A "Use of Force" report was completed, and photographs were taken of the plaintiff. (*Id.*) Plaintiff claims that former defendant Nurse Atkinson failed to write down all of plaintiff's injuries, refused to give him medication, did not order x-rays, and refused plaintiff's request to see a doctor. (*Id.*)

While plaintiff was being held in 11 Block, plaintiff's cell was searched, and the officers took his clothing, bedding, coat, underwear, socks, and t-shirt. (Compl. at 18, 20, 33). As the result of this incident, two misbehavior reports were issued against plaintiff. He claims that he did not receive these misbehavior reports until July 25, 2010. (Compl. at 57, 59). In the interim, a deprivation order was issued, by which plaintiff was deprived of paper for seven days. (Compl. at 24, 55). Plaintiff claims that he was put back in his Special Housing Unit ("SHU") cell without any clothes, other than a t-shirt and one pair of underwear. He had a mattress, but had no sheets, towels, or a pillowcase for seven days. (Compl. at 22). He was also fed a restricted diet,

consisting of a "diet loaf" for the same period of time. (Compl. at 26).

Based upon Judge Kahn's January 16, 2015, plaintiff's remaining claims are (1) an Eighth Amendment claim for excessive force against defendants Clemo, McBath, Keleher, and Winston, (Dkt. No. 18 at 8); and (2) an Eighth Amendment conditions-of-confinement[4] claim against defendants LaRose, Kelsh, and Moulton. (Dkt. No. 18 at 14-15).

## II.  <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts

---

[4] The conditions-of-confinement claim includes the allegations that plaintiff was deprived of most of his clothing, paper, and bedding and that he was fed the nutritionally deficient "diet loaf" for seven days.

4

showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273.

In that context, the nonmoving party must do more than "simply show that there is

some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining

whether there is a genuine issue of material fact, a court must resolve all ambiguities,

and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369

U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment

motion, an allegation in an affidavit or verified complaint must not be conclusory or

overly general. *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3

& n.10 (N.D.N.Y. Apr. 24, 2006). Even where a complaint or affidavit contains

specific assertions, the allegations "may still be deemed conclusory if [they are] (1)

'largely unsubstantiated by any other direct evidence' and (2) 'so replete with

inconsistencies and improbabilities that no reasonable juror would undertake the

suspension of disbelief necessary to credit the allegations made in the complaint.'" *Id.,*

2006 WL 1133247, at *3 & n.11 (quoting *Jeffreys v. City of New York*, 426 F.3d 549,

554-55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh

the credibility of the parties at the summary judgment stage, in the rare circumstance

where the plaintiff relies almost exclusively on his own testimony, much of which is

contradictory and incomplete, it will be impossible for a district court to determine

whether 'the jury could reasonably find for the plaintiff,' . . . and thus whether there are

any "genuine" issues of material fact, without making some assessment of the

plaintiff's account.")).

## III.  **Excessive Force**

### A.   **Legal Standards**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).  To sustain a claim of excessive force, a plaintiff must establish the objective and subjective elements of an Eighth Amendment claim.  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).  To satisfy the objective element, the plaintiff must show that the resulting harm or deprivation was sufficiently serious. *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' . . . or 'significant' injury, . . . provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.' " *United States v. Walsh*, 194 F.3d 37, 47-48 (2d Cir. 1999) (quoting *Hudson*, 503 U.S. at 7-10) (citations omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000) (citation omitted).  The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*.  (quoting *Hudson*, 503 U.S. at 7).  In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:  the extent of the injury and the mental state of the

defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

## B. Application

In support of the defendants' motion for summary judgment, they have submitted the declarations of defendants Captain[5] Kelsh and Corrections Officers Winston and Keleher. (Dkt. Nos. 36-4, 36-5, and 36-6). Defendants have also filed as exhibits to the declaration of defendant LaRose, the documents relating to the use of force on July 16, 2010 and the disciplinary hearings which resulted from the incident. (Dkt. Nos. 36-2 & 36-7 - Exhibits B, C, D, F). Excerpts of plaintiff's deposition have been attached as Exhibit 1 to the affidavit of defense counsel, Melissa A. Latino, AAG. (Dkt. No. 36-3 & Ex. 1). Attached to the defendants' reply papers is the declaration of defendant Clemo. (Dkt. No. 43-2).

Defendant LaRose, who currently holds the rank of Lieutenant, was a Corrections Sergeant at Upstate at the time of this incident. (LaRose Decl. ¶ 1). Defendant LaRose states that on July 16, 2010, he was assigned to Building 11 at Upstate, and was making his rounds on the A-Gallery of that building. (*Id.* ¶ 7). He observed that plaintiff had white, state issued paper covering the lights in his cell, obstructing the view into his cell. (*Id.*) The paper was affixed to the light with

---

[5] "Captain" is defendant Kelch's current rank. At the time of the incident, defendant Kelsh held the rank of Lieutenant. (Kelch Decl. ¶ 1) (Dkt. No. 36-6).

toothpaste.[6] (*Id.*)  Defendant LaRose states that an inmate must have a light on in his cell at all times, and an inmate's use of paper, or any other object to cover his cell light or to obstruct the view into the cell is a serious violation. (*Id.* ¶ 8).  The officers must be able to see inside the cells so that they can determine whether the plaintiff is present, healthy, and not "engaging in any inappropriate [or] dangerous behavior." (*Id.*)  Defendant LaRose also states that inmates have been known to hide contraband in their lights, and any obstruction could cause an officer to be unable to see if the inmate were hiding contraband in the light cover. (*Id.* at ¶ 10).  All inmates are informed of this rule and are told that if they use any of their property to conceal contraband or to obstruct an officer's view into the cell, the inmate may be deprived of that property. (*Id.* ¶ 11).  This rule is also contained in the rule book which inmates are given upon their entrance into DOCCS. (*Id.* ¶ 12) (citing Rule No. 112.22 & 7 NYCRR § 270.2(b)(13)(iv).

Defendant LaRose states that upon observing the violation, he ordered plaintiff to remove the paper from the light, but plaintiff refused.[7]  Defendant LaRose then advised the plaintiff that because of his conduct, his cell would have to be searched to check for any hidden contraband.  For the search to occur, the inmate must be removed from his cell and placed in a "holding pen." (*Id.* ¶ 14).  Such searches are authorized by DOCCS Directive No. 4910. (*Id.* & Ex. A).  Defendant LaRose ordered plaintiff to put his hands behind his back so that he could be removed from his cell, and plaintiff

---

[6] Defendant LaRose states that plain white paper that is doubled and stuck to the light with toothpaste can significantly diminish the light and substantially impair the officers' view into the cell. (LaRose Decl. ¶ 9).

[7] Defendant LaRose states that he had previously counseled plaintiff on this inappropriate conduct. (LaRose Decl. ¶ 12).

refused, stating "'[c]ome in and get me.'" (*Id.* ¶ 15). Defendant LaRose warned plaintiff that if he continued to refuse, an extraction team would have to be called to get him out of the cell. (*Id.* ¶ 16). Despite defendant LaRose's warning, plaintiff continued to refuse. (*Id.* ¶ 17).

At that point, defendant LaRose radioed the Assistant Watch Commander to advise him of the situation and request a cell extraction team. (*Id.* ¶ 18). Captain Quinn was the "officer-of-the-day" and authorized the extraction, after which the Assistant Watch Commander called[8] "various officers throughout the facility to assemble an extraction team." (*Id.*) When the team was assembled at plaintiff's cell, defendant Kelsh asked plaintiff to voluntarily exit his cell, and plaintiff again refused. (Kelsh Decl. ¶ 10). Thus, defendant Kelsh, who was the highest ranking officer at the facility on that date, ordered the extraction to proceed.[9] (LaRose Decl. ¶ 20; Kelsh Decl. ¶ 10). Neither defendant LaRose, nor defendant Kelsh participated in the physical extraction. (LaRose Decl. ¶ 21, Kelsh Decl. ¶ 11).

The extraction team consisted of defendants Clemo, Winston, Keleher, and Moulton. The conduct of these defendants is outlined in the Use of Force report that

---

[8] Defendant LaRose makes this statement on information and belief because he was not responsible for calling the individuals who ultimately made up the extraction team. (LaRose Decl. ¶ 18). Defendant LaRose states that "[i]n the normal course," corrections officers who are on duty in the housing area of the inmate who requires the extraction, are not called upon to participate in the extraction. (*Id.* ¶ 19). Generally, the Assistant Watch Commander assembles the officers from other parts of the facility, and thus, because defendant LaRose called for the extraction, he would not have participated on the team of officers who performed the physical extraction. (*Id.*)

[9] Defendant LaRose states that, as the highest ranking officer at the facility, defendant Lieutenant Kelsh was responsible for the "final negotiation" with the inmate to encourage him to leave his cell voluntarily. (LaRose Decl. ¶ 20). If the inmate continued to refuse, then it was defendant Kelsh's responsibility to order the extraction to proceed. (*Id.*)

was completed after the incident and is filed as Exhibit B to defendant LaRose's declaration. (Dkt. No. 36-2 at 40-52). Each officer in the extraction team and defendant LaRose filed a report which was attached to the Use of Force report. (*Id.* at 48-52). In his report, defendant Clemo states that he entered plaintiff's cell, striking him with a shield in the upper torso, forcing him to the floor. (*Id.* at 49). Officer Clemo then took control of plaintiff's upper torso with both hands while mechanical restraints were placed on his wrists. (*Id.*)

In his memorandum,[10] defendant Winston wrote that he entered plaintiff's cell and using both hands, he forced plaintiff's right arm behind his back "so that mechanical restraints could be applied." (*Id.* at 50). Defendant Clemo remained in control of plaintiff's right arm, helped him to his feet and escorted him to 11 Building to be examined by medical personnel. (*Id.*) After the examination defendant Winston escorted plaintiff back to his cell "without incident." (*Id.*) In his memorandum, defendant McBath states that he entered plaintiff's cell and took control of his left arm with both hands until the mechanical restraints were applied. (*Id.* at 51). Defendant McBath also participated in escorting plaintiff to the "lower holding pen" for photos and medical evaluation. (*Id.*) Defendant McBath also states that he participated in escorting plaintiff back to his cell without incident after the examination. (*Id.*) Defendant Keleher states that he was the officer who placed the mechanical restraints on plaintiff during the incident. (*Id.* at 52). Each of the defendant officers who filed

---

[10] Although defendant Winston has submitted a declaration, the court is citing to his memorandum because his declaration states that he "stand[s] by statements made in the Use of Force Report" and maintains his "position asserted therein." (Winston Decl. ¶ 5) (citing LaRose Decl. Ex. B - Use of Force Report with To/From Memorandum).

declarations deny having used excessive force himself or witnessing any of the other officers using excessive force during the extraction. (Keleher Decl. ¶ 8; Winston Decl. ¶ 8; LaRose Decl. ¶ 26; Kelsh Decl. ¶ 13; Clemo Decl. ¶ 8).

Defendant LaRose states that he was outside plaintiff's cell during the extraction and monitored its progress. (LaRose Decl. ¶ 22). Plaintiff was examined by former defendant Nurse Atkinson, who noted a small abrasion on the back of plaintiff's head.[11] (LaRose Decl. ¶ 24 & Ex. B at CM/ECF p.41). Nurse Atkinson's typed[12] report states that plaintiff was examined in the holding pen in his undershorts. He was alert and oriented in three spheres. (*Id.*) Plaintiff was "argumentative, uncooperative, swearing," and called Nurse Atkinson names. (*Id.*) Nurse Atkinson stated that, although plaintiff complained of multiple injuries, the nurse found only a "superficial abrasion" in the back of plaintiff's head with a small amount of bleeding and "minimal to no swelling." (*Id.*) His eyes were "bloodshot," but apparently this was not unusual for plaintiff. He had good range of motion, did not lose consciousness during the incident, and was in "no acute distress." (*Id.*) His wound was cleaned with Betadine. (*Id.* at 41, 43). The type-written report also states that the incident was video-taped, but no video has been submitted by defendants.[13] (*Id.*)

---

[11] Plaintiff also submitted this document as part of his complaint. (Compl. at CM/ECF p.45).

[12] There appears to be a hand-written report that contains the same information about the physical examination, but the hand writing is very difficult to read. (LaRose Decl. Ex. B at CM/ECF p.43). The court will rely on the type-written page.

[13] In plaintiff's response, he mentions something about a video in one paragraph, but on the next page he criticizes the defendants for their failure to video tape the incident. (Dkt. No. 41 ¶¶ 17, 20). Thus, plaintiff also appears to imply that there is no video tape of the incident.

Plaintiff was deposed in this action on September 18, 2015, and excerpts of his deposition have been filed as an exhibit to defense counsel's declaration. (Dkt. No. 36-3). When defense counsel asked plaintiff what happened on July 16, 2010 at approximately 7:15 p.m., plaintiff stated that he was "not sure," and that he did not "recall . . . exactly what really took place." (Pl.'s Dep. at 19)[14] (Dkt. No. 36-3). Plaintiff admitted that he did remember a Sergeant coming to plaintiff's cell, but he did not "recall what he said, but sometime later he left my door, and after some discussion, I don't recall just what it was," he left. (*Id.*) Plaintiff then stated that, after half an hour or forty-five minutes, the officer returned to his door, and again, plaintiff did not recall "just what was said," but suddenly, his door was being opened. (*Id.*)

Plaintiff described the incident as the officers entering his cell "Officer Clemo in the shield and everything, they are rushing to my cell with the shield and hit me besides [sic] my head and knocked me down on the bed and they ended up handcuffing me, roughing me up and then bringing me out of my cell." (Pl.'s Dep. at 20). Then, "[t]hey brought [plaintiff] out of [his] cell . . . [and] went down the hall into a holding area . . . ." (*Id.*) Plaintiff stated that he was asleep when the officer first came to his cell, and plaintiff continued to insist that he had no idea what the conversation was that he had with the officers prior to the incident. (Pl.'s Dep. at 21). Plaintiff testified that when the officers arrived at his cell, he was "sitting" on the bed, and the "officers bum rushed my cell . . . ." (Pl.'s Dep. at 26). Plaintiff testified that the officers came into his cell,

---

[14] Although the pages of the deposition do not run consecutively because defendants have filed only excerpts of the deposition, the court will cite to the actual pages of the deposition as numbered at the top right hand corner of the page.

knocked him down onto the bed, got him onto the floor, and "then I was being handcuffed." (Pl.'s Dep. at 27). During the deposition, plaintiff also stated that there were several "white shirts" lieutenants standing outside of his cell when the extraction team brought him out. (Pl.'s Dep. at 33). Plaintiff stated that he was wearing only his underwear on at the time, and that his "private everything" was showing.[15] (Pl.'s Dep. at 35).

Plaintiff testified that he was aware of the rule that one light had to stay on all night and that officers needed to be able to see into the cells, but stated that he was "never advised . . . why . . . ." (Pl.'s Dep. at 36). Plaintiff did testify that he did not have a problem with the guards being able to look into his cell because they had to "make sure [he was] ok due to [his] medical conditions." (Pl.'s Dep. at 37). There was no further discussion of the alleged assault in the excerpts of the deposition provided by defendants. Plaintiff never alleged during the deposition that he was punched or kicked or otherwise hit. Instead, he used the term "roughed up." (Pl.'s Dep. at 20). The only impacts that he describes are the shield hitting him, and being taken to the floor. Without describing any further blows, he states that he was handcuffed and escorted to the holding cell.

Plaintiff conceded that there was some "discussion" with the officer who came to

---

[15] There is one memorandum in the record, indicating that plaintiff's pictures were not taken appropriately because the photographs should not have been taken with plaintiff's "private parts . . . partially exposed." (Def.s' Ex. B, Dkt. No. 36-2 at 45). The memorandum is from Captain T. Zerniak to Superintendent Rock. (*Id.*) Plaintiff has filed the photographs as exhibits to his complaint, but the photographs and the individual who took them are not an issue in this case. (Dkt. No. 1 at CM/ECF pp. 48-51). However, it is clear that plaintiff was in his underwear at the time of the incident. The memorandum indicates that the Supervisor was counseled on the proper procedures, and that he was "receptive to this counseling."

his cell and some discussion with the officers who came back to his cell later, but he conveniently forgot what that conversation was all about. Plaintiff's deposition testimony is much more consistent with the defendants' description of the incident than the description contained in plaintiff's complaint. Understandably, if plaintiff was refusing to come out of his cell, and told defendants to "come in and get" him, there could have been "rough" behavior. Defendants allege that every extraction involves going in with a shield. Defendants admit hitting plaintiff's body with the shield and taking him down to the floor, actions that they deemed necessary to get him out of the cell.

Although the fact that plaintiff had minimal injuries is not dispositive of the issue of excessive force, it is a factor to consider in determining whether defendants acted in a malicious or wanton manner. *Scott, supra.* As stated above, other factors include the state of mind of the defendants. *Id.* In this case, none of the defendants were involved in the initial discussion with plaintiff. They were called by a supervisor from completely different parts of the facility to participate in an extraction team. Thus, their state of mind was simply that an inmate was refusing to come out of his cell, and they were tasked with removing him. Because plaintiff was "refusing" to come out of his cell, and these defendants were not initially involved in the exchange with plaintiff, it is reasonable to believe that the extraction team perceived a threat of potential violence from the plaintiff. Defendants' testimony that they entered plaintiff's cell, knocked him to the floor, controlled his arms, handcuffed him, and took him out of the cell shows that they did make an effort to "temper the severity of a forceful response."

Although plaintiff alleges that Nurse Atkinson did not document all his injuries, the court notes that Nurse Atkinson specifically stated that plaintiff was complaining about multiple injures, but that the nurse only noted the "superficial" abrasion on the back of his head. (LaRose Decl. ¶ 24 & Ex. B at CM/ECF p.41). If the nurse had been trying to "hide" plaintiff's injuries, she would not have mentioned that plaintiff was complaining of other injuries. She would simply have stated that she only noted the abrasion.

Plaintiff has attached what appears to be a grievance to his original complaint. (Dkt. No. 1 at 61). In the grievance, dated July 16, 2010, plaintiff states that he was "seriously injured," during an incident on July 15, 2010, and he hurt his back, neck,[16] right cheek below and above the eye, left knee, both sides, and both wrists.[17] However, there are no specifics regarding how he obtained these alleged "injuries," and oddly, the date on the letter is July 16, 2010 (the date of the incident), while plaintiff alleges that these injuries were sustained on July 15, 2010.[18] In any event, the court notes that, given that plaintiff was hit with the shield and taken to the floor, it is possible that he would have been sore or had some pain as a result of the incident, particularly given his extensive medical history. There is no question that force was used. However, as stated above, the issue is whether the defendants used force to maintain order and security or whether it was malicious.

---

[16] Plaintiff has written "knox," but the court assumes that his "neck" was injured.

[17] Plaintiff has written "both risk," but the court assumes that he means "wrists."

[18] It is also unclear when plaintiff would have written this document because his paper was taken away from him immediately after the search of his cell on July 16, 2010.

Attached to his response, plaintiff has attached many of the same documents that are already in the record. (*See e.g.* Dkt. No. 41 at CM/ECF pp. 13-18). Plaintiff has also filed a variety of recent medical records, documenting plaintiff's medical conditions, most of which date back long before the incident in question.[19] (*Id.* at 34-37, 39-45). The defendants do not dispute that plaintiff has medical issues, but there is no indication that any of the medical documents that plaintiff submits are in any way related to the incident in 2010. In fact, one of the reports notes that plaintiff's low back pain began with a motor vehicle accident in 1988 and was reinjured in 2001 after a fall. (*Id.* at 68). One of the 2015 reports states that plaintiff was referred for left upper limb pain for which plaintiff had an "approximate[ly] 2 year history." (*Id.* at 73). The onset of this pain would have been three years after the incident in question.

Thus, defendants have shown that the force they used was for the purpose of maintaining order and security, and not malicious, wanton, or for the purpose of causing plaintiff harm. When an inmate refused to come out of his cell and states "come in and get me," this sets up a potentially dangerous situation for the officers, which justifies the shield and taking plaintiff to the floor to place handcuffs on his wrists. Plaintiff's only response to the defendants' specific factual allegations is a claim of no recollection or vague and general allegations, not inconsistent with the

---

[19] The court would point out that plaintiff's most recent MRI, discussed in a 2015 medical report indicates that although plaintiff has back and "radicular like pain," the MRI did not show significant nerve impingement, and only mild disc degeneration at L4-5 "otherwise normal." (Dkt. No. 41 at 45). The doctor stated that plaintiff did not want steroid injections, and "it's hard to justify [those] anyways [sic]." The doctor refused to recommend opoids and suggested that plaintiff would benefit from NSAIDS, an increase in Gabapentin, and muscle relaxants, but plaintiff stated that he would "rather find another physician for his pain management." (*Id.*)

defendants' accounts.  Given the undisputed facts in the record and plaintiff's failure to raise a genuine issue of material fact, evidenced by his deposition testimony and the records submitted by defendants, no rational jury could find in plaintiff's favor, and plaintiff's excessive force claim may be dismissed.

## IV.  Conditions of Confinement

### A.    Legal Standards

The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety.  *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  Under the objective standard, a plaintiff must allege a deprivation "'sufficiently serious' such that the deprivation denied the minimal civilized measures of live's necessities." *Curry v. Kerik*, 163 F. Supp. 2d 232, 236 (S.D.N.Y. 2001); *Simmons v. Cripps*, No. 12 Civ. 1061, 2013 WL 1290268, at *17 (S.D.N.Y. Feb. 15, 2013); *Inesti v. Hosan*, No. 11 Civ. 2596, 2012 WL 3822224, at *7 (S.D.N.Y. Sept. 4, 2012).

The subjective element of the Eighth Amendment analysis focuses on whether

the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. at 847. "A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendant[] sufficient to satisfy the subjective component of the deliberate-indifference standard." *Hall v. Bennett*, 379 F.3d 462, 464 (7th Cir. 2004) (citing inter alia *Farmer*, 511 U.S. at 842). Common sense is relevant to deciding the obviousness of the risk. *See Fruit v. Norris*, 905 F.2d 1147, 1150–51 (8th Cir. 1990), *cited in Hall*, 379 F.3d at 465.

A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Farmer*, 511 U.S. at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be

sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

## B.    Application

In this case, plaintiff claims that after the July 16, 2010 incident, in addition to depriving him of his paper, he was deprived of most of his clothing and his bedding. He also claims that he was fed a "nutritionally inadequate" diet loaf. The court notes that the "restricted diet" was imposed on plaintiff as a sanction for the various misbehavior charges associated with the incident. (Def.s' Ex. D) (Dkt. No. 36-7 at 2). Plaintiff was charged with refusing a direct order, refusing a cell search, a movement violation, interference with an employee, and a visibility obstruction. (*Id.*) The hearing took place on July 29, 2010, but plaintiff "'Refused to Attend.'" (*Id.* at 4, 5). Because plaintiff was already in SHU for a prolonged period of time, the hearing officer determined that "there [were] no other sanctions available."[20] (*Id.* at 3). Lieutenant Ranieri, the hearing officer, imposed a fourteen (14) day restricted diet, which was modified by the Superintendent to five (5) days. (*Id.* at 2). None of the remaining named defendants were responsible for the restricted diet.[21] (LaRose Decl. ¶ 33-34;

---

[20] Plaintiff did not challenge, and there is no issue regarding due process at the hearing after which the diet was imposed. First, plaintiff did not name the hearing officer as a defendant, and in any event, the imposition of a restricted diet does not rise to the level of a liberty interest protected by due process. *See Adams v. Rock*, No. 9:12-CV-1400 (GLS/ATB), 2015 WL 1312738, at *5-6, (N.D.N.Y. Dec. 9, 2014).

[21] In order for the named defendants to be liable for any constitutional violation arising out of the imposition of the restricted diet, they would have to be "personally involved" in its imposition. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). Thus, any claims relative to the restricted diet would have to be dismissed as against all the defendants in this action in any event.

Kelsh Decl. ¶ 21).

Courts in this circuit routinely have dismissed Eighth Amendment claims based on dietary restrictions imposed for disciplinary reasons, finding that the inmates failed to establish sufficiently "serious" deprivations. *See, e.g., McEachin v. McGuinnis*, 357 F.3d 197, 199-200 (2d Cir. 2004) (affirming district court's dismissal of Eighth Amendment claim alleging, *inter alia*, that inmate was placed on a restricted diet consisting of a food "loaf" for seven days pending a disciplinary hearing); *Smith v. Burge*, No. 9:03-CV-955 (LEK/GHL), 2006 WL 2805242, at *1, 11 & n.78 (N.D.N.Y. Sept. 28, 2006) ("[a]t most, Plaintiff was deprived of food that tasted good for a period of seven days") (collecting cases); *Willey v. Kirkpatrick*, No. 07-CV-6484, 2013 WL 434188, at *10 (W.D.N.Y. Feb. 4, 2013). In this case, although plaintiff states in a conclusory fashion that the diet was "nutritionally inadequate," he has alleged no ill effects of the diet that he was only subjected to for five days.

Plaintiff also claims that the deprivation of his clothing and his bedding rose to the level of cruel and unusual conditions of confinement. After plaintiff was extracted from his cell on July 16, 2010, a search was conducted, and the officers removed the obstruction from his light. (LaRose Decl. ¶ 30). Subsequently, a deprivation order was issued, depriving plaintiff of paper in particular.[22] (*Id.* & Ex. F, Dkt. No. 36-7 at 29). The deprivation order itself addressed only the paper, however, other items that could be used to cover the light were also removed from plaintiff's cell as "contraband." This

---

[22] Defendant LaRose states in his declaration that he recommended that plaintiff be deprived of paper because that was the specific material being used to cover his light at that time. (LaRose Decl. ¶ 44)

included bedding, state-issued clothing, and bed linens. (*Id.* & Exs. B; Dkt. No. 36-2 at 47). The deprivation order was authorized by Captain Quinn, and lasted only until July 22, 2010 – six days. (*Id.* Ex. F). Plaintiff was deprived of these items for the safety and security of the facility. In SHU, the officers must have a clear view into the inmate's cell and may deprive the inmate of any materials that he is using, or could use, to obstruct that view. (LaRose Decl. ¶ 40-43).

With respect to plaintiff's clothing, he alleges that was left with a t-shirt, one pair of underwear, and a mattress for seven days. Although plaintiff alleges that this condition was "cruel," he never alleges any health or other problems that he experienced because of this deprivation. As stated above, his property was removed to keep plaintiff from using any of the materials to cover the light in his cell. Because the date of the deprivation was in July, the removal of his coat was not an issue. He was not naked, and he does not claim to have suffered any health problems or any exposure to the cold as the result of the deprivation. While his clothing and bedding may have been minimal, there was a legitimate security reason for the deprivation, and the duration was short enough so that there were no adverse affects.[23] Thus, there was no risk of serious harm to the inmate, and the defendants did not act with deliberate indifference to a serious risk of harm. There is no genuine issue of fact for a jury to

---

[23] Attached to the complaint is a memorandum from Captain Zerniak to Deputy Superintendent of Security Uhler. (Dkt. No. 1 at 56). Captain Zerniak states that he spoke to the plaintiff on July 27, 2010, and that staff had inadvertently failed to return some of plaintiff's legal work. (*Id.*) Captain Zerniak determined that there had been an error and instructed the staff to return the legal work immediately. The staff complied with this direction. (*Id.*) The memorandum states that plaintiff's paper was returned to him on July 22, 2010, and that as of July 27, 2010, "Flemming has all the material that was confiscated on 7/16/10." (*Id.*) Thus, it is clear that the time that plaintiff was deprived of any property was minimal.

determine. Thus, plaintiff's conditions of confinement claim may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 36) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY AS TO ALL REMAINING DEFENDANTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: April 5, 2016

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**